IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MEMPHIS-SHELBY COUNTY
AIRPORT AUTHORITY,

      Plaintiff/Counter-Defendant,

v.                                      No. 01-3041 B

ILLINOIS VALLEY PAVING COMPANY,

      Defendant/Counter-Plaintiff.

_____

ILLINOIS VALLEY PAVING COMPANY,

      Third-Party Plaintiff,

v.

JACO AIRFIELD CONSTRUCTION, INC.,

      Third-Party Defendant.

_____

JACO AIRFIELD CONSTRUCTION, INC.,

      Fourth-Party Plaintiff,

v.

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

      Fourth-Party Defendants.

_____

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

      Fifth-Party Plaintiffs,

v.

AMERACE, a Division of Thomas & Betts Corporation,

      Fifth-Party Defendant.

_____

ILLINOIS VALLEY PAVING COMPANY,

      Cross-Plaintiff,

v.

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

      Cross-Defendants.

_____

FIREMAN'S FUND INSURANCE COMPANY,

      Defendant/Cross-Claimant,

v.

JACO AIRFIELD CONSTRUCTION, INC.,
NEHRING ELECTRICAL WORKS COMPANY, and
GRAYBAR ELECTRIC COMPANY, INC.,

      Cross-Defendants.

_____

## ORDER GRANTING MOTION OF THE DEFENDANT ILLINOIS VALLEY PAVING COMPANY FOR PARTIAL SUMMARY JUDGMENT
_____

      Plaintiff, Memphis-Shelby County Airport Authority ("MSCAA"), brought the instant action for breach of contract against the Defendants, Illinois Valley Paving Company ("IVP") and Fireman's Fund Insurance Company ("FFIC") arising from a contract between MSCAA and IVP for the reconstruction and extension of a runway at the Memphis International Airport in Memphis, Tennessee. Before the Court is the motion of IVP for partial summary judgment pursuant to Rule

2

56 of the Federal Rules of Civil Procedure.  Specifically, IVP seeks summary judgment as to

MSCAA's right to recovery under General Provision ("GP") 200-03. For the reasons set forth

below, the Defendant's motion for partial summary judgment is GRANTED.

BACKGROUND

The following facts are undisputed unless noted.  On April 18, 1998, MSCAA and IVP

entered into a contract ("Construction Contract") pursuant to which IVP agreed to act as general

contractor for the reconstruction and extension of a portion of Runway 18C-36C and related taxiway

(collectively referred to as the "World Runway") at the Memphis International Airport in Memphis,

Tennessee ("Project 6500").  (Am. Compl. ¶ 4, Ex. A.)  Specification Item L-108 of that contract

provided that

> [u]nderground cable shall conform to the requirements of AC 1504/5345-7,
> Specification for L-824 Underground Electrical Cable for Airport Lighting Circuits.
> Type C single and multiple conductor cables rated 600 volts and 50000 volts shall
> have a minimum .110 cross-linked polyethylene insulation.  Multiple conductor
> cable shall have an overall jacket.
>
> > (a) Cable for airfield lighting service shall be No. 8 AWG, type C,
> > copper, 7-strand, single conductor cable with 5,000 volt cross linked
> > polyethylene insulation.

(Am. Compl. ¶ 9.)  Prior to entering into the contract with MSCAA, on April 17, 1998, IVP

subcontracted with Jaco Airfield Construction, Inc. ("Jaco") for the installation of the electrical

cable and airfield lighting system.  (Am. Compl. ¶ 7; Mem. Supp. IVP's Mot. Partial Summ.

J.("Def.'s Mem."), Ex. C.)  On December 28, 2001, MSCAA filed the instant action against IVP[1]

alleging that it breached the Construction Contract by installing underground airport lighting cable

---

[1] The Plaintiff subsequently amended its complaint on September 22, 2003 to name FFIC as an
additional defendant.

that did not conform to Specifications Item L-108 in the contract requiring that such cable be made of cross-linked polyethylene insulation. (Am. Compl. ¶ 21.) MSCAA contends that, as installed, the electrical cable and lighting system are defective; non-conforming with the Construction Contract; and unsuitable for use in the World Runway. (Am. Compl. ¶ 21-22.) It is undisputed that, allegedly because of these defects, MSCAA did not give final acceptance[2] on Project 6500. (Dep. Joseph M. Polk ("Polk Dep.") at 132-33; Pl.'s Mem. Opp. IVP's Mot. Partial Summ. J. ("Pl.'s Resp.") at 5, no. 11.) MSCAA claims that, despite notice, IVP failed to remove and replace work it deemed defective. (Pl.'s Resp. at 10.) As such, in May of 2002, MSCAA removed and replaced all of the electrical cable involved in Project 6500. (Def.'s Mem. at 3, ¶ 7; Pl.'s Resp. at 4, ¶ 7.) The Plaintiff also withheld $1,094,533.11 of the contract price as a result of the defects. (Def.'s Mem. at 7, no. 17; Pl.'s Resp. at 5, no. 17.) For purposes of the instant motion, the parties do not contest that a breach occurred. Rather, at issue here are the scope of the damages that MSCAA is entitled to recover. In its First Amended Complaint, MSCAA seeks all

> direct, indirect and consequential costs of the removal and replacement of the defective cable, including, but not limited to fees and charges of engineers, architects, attorneys and other professionals, its incidental and consequential damages, lost profits, loss of use of the World Runway and other damages, including the cost of the testing of the electrical cable . . .

(Am. Compl. at 11, ¶ 2.)

Two provisions of the Construction Contract relate to damages. GP 50-10 states that

[a]ll work which does not conform to the requirements of the contract, plans, and

---

[2] GP 50-15 FINAL ACCEPTANCE of the Construction Contract provides, in relevant part, that "[u]pon due notice from the Contractor of presumptive completion of the entire project, the Engineer and Owner will make an inspection. If all construction provided for and contemplated by the contract is found to be completed in accordance with the contract, plans and specifications, such inspection shall constitute the final inspection. The Engineer shall notify the Contractor in writing of final acceptance as of the date of the final inspection." (Pl.'s Mot. Partial Summ. J. ("Def.'s Mot.") at 3, n. 3.)

specifications will be considered unacceptable, unless otherwise determined acceptable by the Engineer as provided in the subsection titled CONFORMITY WITH PLANS AND SPECIFICATIONS of this section.

Unacceptable work, whether the result of poor workmanship, use of defective materials, damage through carelessness, or any other cause found to exist prior to the final acceptance of the work, shall be removed immediately and replaced in an acceptable manner in accordance with the provisions of the subsection titled CONTRACTOR'S RESPONSIBILITY FOR WORK of Section GP-70.

Work done contrary to the instructions of the Engineer, work done beyond the lines shown on the plans or as given, except herein specified, or any extra work done without authority will be considered as unauthorized and will not be paid for under the provisions of the contract.  Work so done may be ordered removed or replaced at the contractor's expense.

Upon failure on the part of the Contractor to comply forthwith with any order of the Engineer made under the provisions of this subsection, the Engineer will have authority to cause unacceptable work to be remedied or removed and replaced and unauthorized work to be removed and to deduct the costs (incurred by the Owner) from any monies due or to become due the Contractor.

(Def.'s Mem., Ex. D.)  Whereas GP 200-03 of the Construction Contract provides that

[t]he Contractor warrants and guarantees to the Owner[3] and the Engineer[4] that all Work[5] will be in accordance with the Contract Documents and will not be defective. Notice of all defects shall be given to the Contractor[6] promptly upon discovery thereof.

If within one year after the date of final acceptance or such longer period of time as may be prescribed by Laws and Regulations or by the terms of any applicable special guarantee or warranty required by the Contract Documents or by any specific provision of the Contract Documents, any Work is found to be defective, the

---

[3]  As defined in the Construction Contract, the "Owner" is MSCAA. (Am. Compl., Ex. A.)

[4]  Allen & Hoshall, Inc. was the Engineer employed by the Plaintiff for Project 6500.  (Def.'s Mot. at 5, ¶ 14; Pl.'s Resp. at 5, ¶ 14.)

[5]  GP 10-60 defines "Work" as "the furnishing of all labor, materials, tools, equipment, and incidentals necessary or convenient to the Contractor's performance of all duties and obligations imposed by the contract, plans, and specifications." (Def.'s Mot. at 3, n. 2.)

[6]  As defined in the Construction Contract, the "Contractor" is IVP. (Am. Compl., Ex. A.)

5

Contractor shall promptly, without cost to the Owner and in accordance with the Owner's instructions, either correct such defective work, or, if it has been rejected by the Owner, remove it from the site and replace it with non-defective work.  If the Contractor does not promptly comply with the terms of such instructions, or in an emergency where delay would cause serious risk of loss or damage, the Owner may have the defective work corrected or the rejected work removed and replaced, and all direct, indirect and consequential costs of such removal and replacement (including but not limited to fees and charges of engineers, architects, attorneys and other professionals) will be paid by the Contractor.

(Def.'s Mem., Ex. E.)  In the instant motion, IVP seeks partial summary judgment as to whether MSCAA is entitled to recover damages pursuant to General Provision 200-03.

STANDARD OF REVIEW

Rule 56( c) provides that a

judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 2 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2552.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving

6

party is entitled to a verdict.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed.2d 202 (1986).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.  In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."  Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).  Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## ANALYSIS OF THE PARTIES' CLAIMS

At issue in the instant motion is whether, under the circumstances in this case, MSCAA is entitled to seek recovery of damages under GP 200-03.  The parties do not dispute that Tennessee law applies to this matter.  Under Tennessee law, courts resolving contract disputes must give effect to the intent of contracting parties at the time of the execution of the agreement.  Planters Gin Co. v. Federal Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002).

> It is not necessarily the real intent, but the expressed or apparent intent, which is sought. The court will not attempt to ascertain the actual mental processes of the parties in entering into the particular contract; rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.

Empress Health and Beauty Spa, Inc. v. Turner, 503 S.W.2d 188, 190 -191 (Tenn. 1973) (quoting 17 Am. Jur. 2d, Contracts, § 245); Planters Gin Co.,  78 S.W.3d at 890 (Tenn.2002) ("The intent of the parties is presumed to be that specifically expressed in the body of the contract."). Contract language must be understood in its "usual, natural, and ordinary meaning." Bradson Mercantile, Inc.

v. Crabtree, 1 S.W.3d 648, 652 (Tenn. Ct. App.1999). "Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made." Id.  Accordingly, where the contract language is clear and unambiguous,  the literal meaning controls the outcome of the dispute. Planters Gin Co., 78 S.W.3d at 890.  Further, an ambiguity does not arise merely because the parties disagree regarding the interpretation of specific provisions.  Warren v. Metropolitan Government of Nashville and Davidson County, Tenn., 955 S.W.2d 618, 623 (Tenn. App. 1997).

Neither IVP nor MSCAA contend that the language in the Construction Contract pertaining to damages in the event of breach is  ambiguous.  However, each offers a different interpretation of the application of the provisions.  IVP maintains that GP 200-03 and GP 50-10 are separate and exclusive damage provisions, the application of which depends on the timing of the breach.  (Def.'s Mem. 9-10.)  Specifically, the Defendant argues that GP 200-03, which relates to the Contractor's warranty and guarantee, is triggered only in circumstances where defects are discovered within one year after the date of final acceptance.  (Def.'s Mem. at 9.)  In contrast, according to IVP, GP 50-10 applies to all defects discovered prior to the final acceptance of the work.  (Def.'s Mem. at 9-10.) The parties do not dispute that MSCAA did not sign off on final acceptance on IVP's work because of the alleged defects in the electrical system.  According to IVP, since final acceptance has never been issued, the defects necessarily were discovered prior to final acceptance and therefore, the more extensive damages permitted by GP 200-03 are not available to MSCAA.

In contrast, MSCAA argues that GP 50-10 and GP 200-03 are not mutually exclusive and, further, that final acceptance is not required to trigger its right to damages under GP 200-03.  (Pl.'s Resp. at 7-10.)  Plaintiff maintains that the first paragraph of GP 200-03 contains IVP's warranty and  guarantee  that  the  work  will  be  performed  in  accordance  with  the  Construction  Contract,

whereas the second paragraph describes its rights in the event that IVP fails to perform. (Pl.'s Resp. at 7-8.)  Under MSCAA's interpretation, these sentences establish two separate and distinct circumstances under which it may recover indirect and consequential damages: (1) when defects are discovered after final acceptance; or (2) when the Contractor refuses to remove and replace defective work.  (Pl.'s Resp. at 7.)  Within the latter category, MSCAA asserts that such damages may be recovered where either (1) accepted work is later found to be defective; or (2) where defective work is rejected before final acceptance.  (Pl.'s Resp. at 8.)  In support of its position, MSCAA notes that the paragraph instructs that the Contractor must "correct . . . defective work, or, if it has been rejected . . . remove it from the site and replace it with non-defective work."  Based on this sentence, MSCAA argues that the use of the disjunctive phrase "or, . . . has been rejected" indicates that final acceptance is not a requirement for applicability, but rather one circumstance under which the provision may be invoked.  (Pl.'s Resp. at 7.)  Because IVP refused to remove and replace the defective work and because the defective work was rejected before final acceptance, according to MSCAA's interpretation, GP 200-03 is applicable.

The Court finds MSCAA's argument to be without merit.  Such an interpretation requires a straining of the express contract language which the Court is not permitted to undertake.  See Warren, 955 S.W.2d at 623-24. As noted above, GP 200-03, entitled "WARRANTY AND GUARANTEE," provides, in full, that

> [t]he Contractor warrants and guarantees to the Owner and the Engineer that all Work will be in accordance with the Contract Documents and will not be defective. Notice of all defects shall be given to the Contractor promptly upon discovery thereof.
>
> *If within one year after the date of final acceptance* or such longer period of time as may be prescribed by Laws and Regulations or by the terms of any applicable special guarantee or warranty required by the Contract Documents or by any specific

9

provision of the Contract Documents, *any Work is found to be defective*, *the Contractor shall promptly*, without cost to the Owner and in accordance with the Owner's instructions, *either correct such defective work, or, if it has been rejected by the Owner, remove it from the site and replace it with non-defective work.* <u>*If the Contractor does not promptly comply with the terms of such instructions*</u>, or in an emergency where delay would cause serious risk of loss or damage, <u>*the Owner may have the defective work corrected or the rejected work removed and replaced*</u>, and all direct, indirect and consequential costs of such removal and replacement (including but not limited to fees and charges of engineers, architects, attorneys and other professionals) will be paid by the Contractor.

(Def.'s Mem., Ex. E.) (emphasis added).  The plain import of the first sentence of the second paragraph of GP 200-03 conveys that where work defects are discovered within one year of the date of final acceptance, the Contractor must promptly remove and replace the work at no cost to the Owner.  The second sentence of the second paragraph provides that, upon failure of the Contractor to comply with "such instructions," namely, the Owner's instructions to remove and replace any defective work discovered within one year of the date of final acceptance, the Owner may choose either to have the defective work corrected or the rejected work removed and replaced.  Where the Owner avails itself of this right, GP 200-03 entitles it to all direct, indirect and consequential costs of the removal and replacement. The reference to "such instructions" clearly joins the second sentence to the limiting clause in the first.  That is, if the Contractor fails to comply with the Owner's instructions to remove and replace defects discovered within one year of the date of final acceptance, it may recover direct, indirect and consequential costs of the removal and replacement.

The Plaintiff's argument that the phrase "or, . . . has been rejected," evidences an intent to include defective work that is rejected before final acceptance within the ambit of GP 200-03 is at odds with the complementary construction of the two sentences comprising the second paragraph. Because the second sentence references the first, the logical understanding is that the Owner is

entitled under GP 200-03 to have only those defects discovered within a year of the date of final

acceptance corrected, where possible, or, if rejected as not capable of correction, removed and

replaced.

In contrast to GP 200-03, GP 50-10 applies to defects discovered prior to final acceptance.

Entitled "REMOVAL OF UNACCEPTABLE AND UNAUTHORIZED WORK," GP 50-10, states

that

> [a]ll work which does not conform to the requirements of the contract, plans, and specifications will be considered unacceptable, unless otherwise determined acceptable by the Engineer as provided in the subsection titled CONFORMITY WITH PLANS AND SPECIFICATIONS of this section.
>
> *Unacceptable work*, whether the result of poor workmanship, use of defective materials, damage through carelessness, or any other cause *found to exist prior to the final acceptance of the work, shall be removed immediately and replaced in an acceptable manner* in accordance with the provisions of the subsection titled CONTRACTOR'S RESPONSIBILITY FOR WORK of Section GP-70.
>
> Work done contrary to the instructions of the Engineer, work done beyond the lines shown on the plans or as given, except herein specified, or any extra work done without authority will be considered as unauthorized and will not be paid for under the provisions of the contract.  Work so done may be ordered removed or replaced at the contractor's expense.
>
> *Upon failure on the part of the Contractor to comply* forthwith *with any order* of the Engineer *made under the provisions of this subsection, the Engineer will have authority to cause unacceptable work to be remedied or removed and replaced* and unauthorized work to be removed *and to deduct the costs* (incurred by the Owner) from any monies due or to become due the Contractor.

(Def.'s Mem., Ex. D.) (emphasis added).  As expressly stated, GP 50-10 requires the removal and

replacement of all unacceptable work found to exist *prior to* the final acceptance of the work.

Where the Contractor refuses to comply with "the provisions of this subsection," namely, the

requirement that the Contractor remove and replace work deemed unacceptable prior to final

acceptance, GP 50-03 authorizes the Owner to either remedy the unacceptable work, or to remove

and replace it, and deduct any costs incurred in doing so.  In contrast to GP 200-03, GP 50-10 does not provide for the recovery of indirect and consequential costs of such removal and replacement, but only the actual costs incurred.

Based on the plain reading of GP 200-03 and GP 50-10, it appears that, as IVP maintains, their application hinges on whether the alleged defects were discovered prior to or within one year after the date of final acceptance.  Because final acceptance was never made on Project 6500, GP 200-03 is not applicable.  This conclusion interprets the provisions in a complementary and logical fashion.  Pursuant to GP 50-10, if the Owner discovers defects and based upon them refuses to make final acceptance, its recourse against a non-compliant Contractor is to correct the defect at cost through the withholding of monies due on the non-completed contract.  In contrast, under GP200-03, if the Owner makes final acceptance, thus concluding the contract and signaling the commencement of the one-year warranty period, and later discovers that the work is defective, it is entitled to correct or to remove and replace the defective work and, in doing so, recover all direct, indirect and consequential costs associated therewith.  Logically, this construction includes a harsher penalty for defective work which has been warranted by the Contractor, thus providing an incentive to inspect and cure defects prior to final acceptance.  Further, once a contractor has received final payment for work, an owner who then discovers defects is more likely to incur legal and other fees in remedying the defects than one who discovered such defects before payment was made.  Contrary to the Plaintiff's argument, MSCAA is not now penalized because it refused to accept defective work. (Pl.'s Resp. at 12.)  Rather, consistent with GP 50-10, it benefitted by not accepting the work by withholding $1,094,533.11 of the contract price for over five-years.

Finally, the Court notes MSCAA's argument that, if final acceptance is a "condition

precedent" to recovery under GP 200-03, because IVP hindered final acceptance, it cannot now utilize its nonoccurrence as a defense to the application of that provision.  In support of its position, the Plaintiff cites the "Prevention Doctrine" which holds that "where one party to a contract takes an action that prevents the other party from being able to fulfill a condition precedent to that contract, the first party may not use its own action as a mechanism for avoiding performance of its contractual obligations." In re General DataComm Industries, Inc., 407 F.3d 616, 626 (3rd Cir. 2005).  A "condition precedent" is "a condition which must be performed before the agreement of the parties shall become a binding contract or it may be a condition which must be fulfilled before the duty to perform an existing contract arises."  Strickland v. City of Lawrenceburg, 611 S.W.2d 832, 837 (Tenn. App. 1980) (citing 17A C. J. S. Contracts § 338).  Neither party has asserted that MSCAA's final acceptance was required before the Construction Contract became binding or before IVP's duty to perform arose.  In fact, most all obligations, excepting the warranty and guarantee set forth in GP 200-03, were, by the terms of the Contract, to be completed before final acceptance.  As such, the Court concludes that final acceptance is not a condition precedent and thus, rejects MSCAA's argument based upon IVP's alleged hindrance of its occurrence. See e.g., Covington v. Robinson, 723 S.W.2d 643, 645 (Tenn. App.1986) (quoting Restatement 2nd, Contracts, § 224) (defining a condition precedent as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, *before performance under a contract is due*.") (emphasis added).

<u>CONCLUSION</u>

Based on the foregoing, the Court GRANTS the motion of the Defendant IVP for partial

summary judgment.[7]

      IT IS SO ORDERED this 31st day of July, 2006.

                    s/  J. DANIEL BREEN
                    UNITED STATES DISTRICT JUDGE

---

    [7]  The Court also notes that Fourth Party Defendant, Graybar Electric Company, Inc. ("Graybar"), filed a response in support of IVP's motion for partial summary judgment.  Nehring Electrical Works Company ("Nehring"), also a Fourth Party Defendant, subsequently filed a motion on February 15, 2006 requesting "joinder" to Graybar's memorandum.  To the extent that the motion seeks joinder, as defined by the Federal Rules of Civil Procedure, Nehring's motion is DENIED.  However, the Court does recognize that Nehring simply incorporates and adopts by reference the facts, law and argument set forth in Graybar's memorandum in support of the motion at issue herein.