IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MEMPHIS-SHELBY COUNTY
AIRPORT AUTHORITY,

    Plaintiff/Counter-Defendant,

v.                                                                        No. 01-3041 B

ILLINOIS VALLEY PAVING COMPANY,

    Defendant/Counter-Plaintiff.

_____

ILLINOIS VALLEY PAVING COMPANY,

    Third-Party Plaintiff,

v.

JACO AIRFIELD CONSTRUCTION, INC.,

    Third-Party Defendant.

_____

JACO AIRFIELD CONSTRUCTION, INC.,

    Fourth-Party Plaintiff,

v.

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

    Fourth-Party Defendants.

_____

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

    Fifth-Party Plaintiffs,

v.

AMERACE, a Division of Thomas & Betts Corporation,

    Fifth-Party Defendant.

___

ILLINOIS VALLEY PAVING COMPANY,

    Cross-Plaintiff,

v.

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

    Cross-Defendants.

___

FIREMAN'S FUND INSURANCE COMPANY,

    Defendant/Cross-Claimant,

v.

JACO AIRFIELD CONSTRUCTION, INC.,
NEHRING ELECTRICAL WORKS COMPANY, and
GRAYBAR ELECTRIC COMPANY, INC.,

    Cross-Defendants.

___

## ORDER DENYING MOTION OF THE DEFENDANTS ILLINOIS VALLEY PAVING COMPANY AND FIREMAN'S FUND INSURANCE COMPANY FOR SUMMARY JUDGMENT

___

Plaintiff, Memphis-Shelby County Airport Authority ("MSCAA"), brought the instant action for breach of contract against the Defendants, Illinois Valley Paving Company ("IVP") and Fireman's Fund Insurance Company ("FFIC") arising from a contract between MSCAA and IVP for the reconstruction and extension of a runway at the Memphis International Airport in Memphis,

Tennessee. Before the Court is the motion of IVP and FFIC for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Defendants' motion for summary judgment is DENIED.

## BACKGROUND

The following facts are undisputed unless noted. On April 18, 1998, MSCAA and IVP entered into a contract ("Construction Contract") pursuant to which IVP agreed to act as general contractor for the reconstruction and extension of a portion of Runway 18C-36C and related taxiway (collectively referred to as the "World Runway") at the Memphis International Airport in Memphis, Tennessee ("Project 6500"). (Am. Compl. ¶ 4, Ex. A.) On December 28, 2001, MSCAA filed the instant action against IVP[1] alleging that it breached the Construction Contract by installing underground airport lighting cable that did not conform to Specifications Item L-108 requiring that such cable be made of cross-linked polyethylene insulation.[2] (Am. Compl.¶ 21.)

At issue in the instant motion is the applicability and effect of General Provision ("GP") 60-02, "Samples, Tests, and Cited Specifications," of the Construction Contract, which provided that

---

[1] The Plaintiff subsequently amended its complaint on September 22, 2003 to name FFIC as an additional defendant.

[2] Specification Item L-108 of the Construction Contract provided that

[u]nderground cable shall conform to the requirements of AC 1504/5345-7, Specification for L-824 Underground Electrical Cable for Airport Lighting Circuits. Type C single and multiple conductor cables rated 600 volts and 5000 volts shall have a minimum .110 cross-linked polyethylene insulation. Multiple conductor cable shall have an overall jacket.
    (a) Cable for airfield lighting service shall be No. 8 AWG, type C, copper, 7-strand, single conductor cable with 5,000 volt cross-linked polyethylene insulation.

(Am. Compl. ¶ 9; Pl.'s Resp. Opp. Def.'s Mot. Summ. J. ("Pl.'s Resp."), Ex. T at L-108 .)

> [a]ll materials[3] used in the work shall be inspected, tested, and approved by the Engineer[4] before incorporation in the work. Any work in which untested materials are used without approval or written permission of the Engineer shall be performed at the Contractor's risk. Materials found to be unacceptable and unauthorized will not be paid for and, if directed by the Engineer, shall be removed at the Contractor's expense. Unless otherwise designated, tests in accordance with the cited standard methods will be made by and at the expense of the Owner. Samples will be taken by a qualified representative of the owner. All materials being used are subject to inspection, test, or rejection at any time prior to or during incorporation into the work. Copies of all tests will be furnished to the Contractor's representative at his/her request.

(Pl.'s Resp. Opp. Def.'s Mot. Summ. J. ("Pl.'s Resp."), Ex. K at GP 60-02.) In lieu of testing, GP 60-03, entitled "Certification of Compliance," stated that

> [t]he Engineer may permit the use, prior to sampling and testing, of certain materials or assemblies when accompanied by manufacturer's certificates of compliance stating that such materials or assemblies fully comply with the requirements of the contract. The certificate shall be signed by the manufacturer. Each lot of such materials or assemblies delivered to the work must be accompanied by a certificate of compliance in which the lot is clearly identified.
>
> Materials or assemblies used on the basis of certificates of compliance may be sampled and tested at any time and if found not to be in conformity with contract requirements will be subject to rejection whether in place or not.
>
> The form and distribution of certificates of compliance shall be as approved by the Engineer.
>
> . . .
>
> The Engineer reserves the right to refuse permission for use of materials or assemblies on the basis of certificates of compliance.

(Pl.'s Resp., Ex. L at GP 60-02.)

Prior to ordering materials, Special Condition ("Special Condition") 110 of the Construction

---

[3] The term "materials" is defined in the contract as "[a]ny substance specified for use in the construction of the contract work." (Pl.'s Resp., Ex. M at GP 10-38.)

[4] Allen & Hoshall, Inc. was the Engineer employed by the Plaintiff for Project 6500. (Mem. Law Supp. Def.'s Mot. Summ. J. ("Def.'s Mot."), Ex. D.)

4

Contract required that the Contractor provide "submittals" which included "all test results and/or certificates necessary to show that the item conforms to the standards specified. Such standards shall include ASTM, AASHTO, FAA, PCA, Federal Specifications or any other standard listed in these specifications." (Pl.'s Resp., Ex. A at SC 110-1.02(A)(1).) Before submission to the Engineer, SC-110 mandated that the Contractor

> shall check the submittals of all items furnished directly by him, and the applicable Subcontractor shall check the submittals of all items furnished by the Subcontractor involved, as follows: check the submittal drawings for completeness and compliance with the contract documents; check and verify all dimensions, field conditions certifications relating to the submittals and certify in writing that these checks have been made.

(Pl.'s Resp., Ex. A at SC 110-1.03(A).) SC-110 further provided that the Engineer "will return for resubmission" all submittals which failed to contain the specified approval and certification; contain discrepancies; "and/or have not been checked by the Contractor or Subcontractor." (Pl.'s Resp., Ex. A at SC 110-1.03(A)(1).) However, pursuant to SC-110,

> submittals reviewed by the Engineer will be a general review only, and acceptance will not relieve Contractor or Subcontractor of responsibility for accuracy of submittals, proper fitting, coordination, construction or work, and furnishing materials and work required by Contract but not indicated on submittals. Review of submittals shall not be construed as accepting departures from Contract requirements.

(Pl.'s Resp., Ex. A at SC 110-3.01(B).)

Jaco Airfield Construction, Inc. ("Jaco"), the subcontractor who procured the airfield lighting cable, obtained from Nehring Electrical Works Company ("Nehring"), the manufacturer of the cable, a submittal in the form of a "cut sheet" stating that the cable was compliant with all contract

5

specifications and forwarded it to IVP on June 4, 1998.[5]  (Def.'s Reply Pl.'s Resp. Opp. Pl.'s Mot. Summ. J. ("Def.'s Reply") at 8; Pl.'s Resp., Ex. B.)  IVP subsequently provided the submittal to the Pickering Firm, who was employed as the Design Engineer on Project 6500.  (Pl.'s Resp., Ex. B.)  As submitted to the Design Engineer, the cut sheet, while on Nehring letterhead, did not contain the manufacturer's signature.  (Pl.'s Resp., Ex. B.)  The cut sheet was "approved as submitted" by the Design Engineer on June 9, 1998.  (Pl.'s Resp., Ex. B.)

It is uncontested that neither the Plaintiff nor its Engineer tested the allegedly defective electrical cable before installation into Project 6500.[6]  (Pl.'s Resp. at 4, no. 6; Dep. Joseph Polk ("Polk Dep.") at 486.)  Further, MSCAA does not maintain that it obtained a certificate of compliance signed by the manufacturer of the cable.  However, it does contend that "cut sheets" and "catalogue pages" used in the submittal process to obtain approval of the cable, which explicitly stated that the cable was compliant with all contract specifications, was treated by the parties as a certificate of compliance.  (Pl.'s Resp. at 20.)

## STANDARD OF REVIEW

Rule 56( c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

[5] Consistent with Contract Specification L-108, the cut sheet provided by IVP described the airport lighting cable as "single conductor composed of . . . stranded copper . . . cross-linked polyethylene insulation, rated 600 volts or 5000 volts as identified."  (Pl.'s Resp., Ex. B.)  Under "Specifications," the cut sheet identified "Federal Aviation Administration per L-824, type C."  (Pl.'s Resp., Ex. B.)

[6] MSCAA disputes that it was required to test the cable by the terms of the contract.  (Pl.'s Resp. at 4, factual response no. 6.)  However, it does not contend that it undertook any testing prior to installation.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 2 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324, 106 S. Ct. at 2552.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed.2d 202 (1986).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.  In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."  Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).  Finally, the "judge may not make credibility determinations or weigh the evidence."  Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## ANALYSIS OF THE PARTIES' CLAIMS

IVP and FFIC contend in the instant motion that they are entitled to summary judgment on

the Plaintiff's claims because, even assuming the validity of MSCAA's allegations that they breached the Construction Contract by installing defective cable, MSCAA had already materially breached the contract by not inspecting and testing the cable as provided in GP 60-03 or obtaining a certificate of compliance signed by Nehring prior to installation. Under the Defendants' interpretation of GP 60-02 and GP 60-03, MSCAA's failure to either inspect or obtain a certificate of compliance signed by the manufacturer was a material breach of the contract which insulates the Defendants from liability for any subsequent breach.

In response, MSCAA first asserts that GP 60-02 is inapplicable because the cable at issue in the instant action is not a "material" as defined in the contract. Accordingly, the Court must initially look to the terms of the contract to determine whether GP 60-02 is relevant to the resolution of this matter. The parties do not dispute that Tennessee law applies. Under Tennessee law, courts resolving contract disputes must give effect to the intent of contracting parties at the time of the execution of the agreement. Planters Gin Co. v. Federal Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002).

> It is not necessarily the real intent, but the expressed or apparent intent, which is sought. The court will not attempt to ascertain the actual mental processes of the parties in entering into the particular contract; rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.

Empress Health and Beauty Spa, Inc. v. Turner, 503 S.W.2d 188, 190 -191 (Tenn. 1973) (quoting 17 Am. Jur. 2d, Contracts, § 245); Planters Gin Co., 78 S.W.3d at 890 (Tenn.2002) ("The intent of the parties is presumed to be that specifically expressed in the body of the contract."). Contract language must be understood in its "usual, natural, and ordinary meaning." Bradson Mercantile, Inc. v. Crabtree, 1 S.W.3d 648, 652 (Tenn. Ct. App.1999). "Courts cannot make contracts for parties but

can only enforce the contract which the parties themselves have made." Id.  Accordingly, where the contract language is clear and unambiguous, the literal meaning controls the outcome of the dispute. Planters Gin Co., 78 S.W.3d at 890.  Further, an ambiguity does not arise merely because the parties disagree regarding the interpretation of specific provisions.  Warren v. Metropolitan Government of Nashville and Davidson County, Tenn., 955 S.W.2d 618, 623 (Tenn. App. 1997).

The inspection, testing and approval requirement in GP 60-02 applies to "all materials used in the work." (Pl.'s Resp., Ex. K at GP 60-02.)  As defined elsewhere in the contract, "materials" include "any substance specified for use in the construction of contract work." (Pl.'s Resp., Ex. M at GP 10-38.)  In support of its position that the airport lighting cable is not a material, MSCAA offers GP 60-01[7], "Source of Supply and Quality Requirements," which makes distinct reference

---

[7] GP 60-01 provides that

> [t]he materials used on the work shall conform to the requirements of the contract, plans, and specifications.  Unless otherwise specified, such materials that are manufactured or processed shall be new (as compared to used or reprocessed).
>
> In order to expedite the inspection and testing of materials, the Contractor shall furnish complete statements to the Engineer as to the origin, composition, and manufacture of all materials to be used in the work.  Such statements shall be furnished promptly after execution of the contract but, in all cases, prior to delivery of such materials.
>
> At the Engineer's option, materials may be approved at the source of supply before delivery is started.  If it is found after trial that sources of supply for previously approved materials do not produce specified products, the contractor shall furnish materials from other sources.
>
> The Contractor shall furnish airport lighting equipment that conforms to the requirements of cited materials specifications.  In addition, where an FAA specification for airport lighting equipment is cited in the plans or specifications, the Contractor shall furnish such equipment that is: (a)  Listed in FAA Advisory Circular (AC) 150/5345-1, Approved Airport Equipment, that is in effect of the date of advertisement; and, (b) Produced by the manufacturer qualified (by FAA) to produce such specified and listed equipment.

(Pl.'s Resp., Ex. K at GP 60-01.)

to both "materials" and "airport lighting equipment." (Pl.'s Resp., Ex. K at GP 60-01.) According to Plaintiff, these categories are distinct and exclusive. Because the cable at issue is a component of the airport lighting system, MSCAA maintains that it is "airport lighting equipment" and thus, not a material.

In addition, MSCAA offers in support paragraph 3 of GP 60-01 which states that

> [i]f it is found after trial that sources of supply for previously approved materials do not produce specified products, the contractor shall furnish materials from other sources.

(Pl.'s Resp, Ex. K at GP 60-01.) MSCAA points out that, as defined in the Construction Contract, the term "materials" utilized in GP 60-01 includes "substance[s] specified for use in the construction of contract work." (Pl.'s Resp., Ex. M at GP 10-38.) According to the Plaintiff, "substance," as utilized in this definition, refers to such items as crushed aggregate, Portland cement, sand, gravel, or bituminous materials. (Pl.'s Resp. at 11-12.) It then reads GP 60-01 to further define the term "materials" as those which "produce specified products." (Pl.'s Resp, Ex. K at GP 60-01.) Thus, under MSCAA's reading of the Construction Contract, a "material" is a "substance" which "produce[s] a specified product." Unlike "substances" such as cement or sand, the cable at issue here cannot be used to "produce specified products." Therefore, according to MSCAA, the cable is not a material. (Pl.'s Resp. at 11-12.)

MSCAA also points out that L-108, the specification for the airport lighting cable, itself contains a testing provision which mandates that testing occur after installation. Specifically, L-108-3.6 states that "[t]he Contractor shall furnish all necessary equipment and appliances for testing the underground cable circuits after installation" and that the Contractor bears the burden of demonstrating circuit functionality and insulation resistance "to the satisfaction of the Construction

10

Manager." (Pl.'s Resp., Ex. T at L 108-3.6.) Because this provision, which most directly deals with the cable at issue, does not reference any testing required by the Owner prior to installation, MSCAA maintains that it was under no contractual obligation to test the cable prior to it being installed.

The Court finds Plaintiff's arguments to be without merit. The Construction Contract defines "materials" as "any substance specified for use in the construction of the contract work." (Pl.'s Resp., Ex. M at GP 10-38.) There is nothing to be drawn from the reading of this definition that "substance" should be so narrowly defined, as MSCAA contends, to encompass only raw materials which comprise other products used in the work. As further support of this conclusion, the Contract defines "work" as the "furnishing of all labor, materials, tools, equipment, and incidentals necessary or convenient to the Contractor's performance of all duties and obligations imposed by the contract, plans, and specifications." (Pl.'s Resp., Ex. M at GP 10-60.) MSCAA does not dispute that IVP was contractually obligated to provide the cable necessary for the completion of Project 6500. However, as the cable is a permanent component of the completed work, as opposed to an apparatus simply utilized in construction of the Project, it cannot aptly be described as a "tool" or "equipment."[8] Rather, the most logical categorization of the cable within the definition of "work" is as a "material." GP 60-01 does not refute this conclusion. The provision explicitly states that airport lighting equipment must conform to "the requirements of the cited materials specifications." (Pl.'s Resp., Ex. K at GP 60-01.) Thus, even were airport lighting equipment to be distinct from materials, such equipment is still subject to the same requirements.

---

[8] "Equipment" is defined in the Construction Contract as "[a]ll machinery, together with the necessary supplies for upkeep and maintenance, and also all tools and apparatus necessary for the proper construction and acceptable completion of the work." (Pl.'s Resp., Ex. M at GP 10-27.) "Tools" are not defined in the Contract.

L-108 itself implicitly describes the cable as a material through the organization of the specification. L-108 provides, in part, the following organizational layout:

>   EQUIPMENT AND MATERIALS
>       108-2.1 GENERAL
>       **108-2.2 CABLE**
>       108-2.3 BARE COPPER WIRE (COUNTERPOISE)
>       108-2.4 CABLE CONNECTIONS
>       108-2.5 HEAT SHRINKABLE KIT
>
>   CONSTRUCTION METHODS
>       108-3.1 GENERAL
>       108-3.2 INSTALLATION IN DUCT OR CONDUIT

(Pl.'s Resp., Ex. T at L-108 (emphasis added).) Because subsection 108-2.2 is within the "Equipment and Materials" section and is not, by contract definition, "equipment," it must logically be considered a "material." The Court also rejects Plaintiff's reading of GP 60-01 as it requires a straining of the contract language which the Court is not permitted to undertake. Warren, 955 S.W.2d at 623-24. As plainly stated, the provision merely provides that, in the event sources of supply are unable to produce products specified in the contract, the Contractor must furnish the materials from alternate sources. (Pl.'s Resp., Ex. K at GP 60-01.) Nor does the specific testing provision in L-108 for the underground cable circuits indicate that the parties did not intend for GP 60-02 to apply to cables. Rather, L-108-3.6 imposes a burden on the Contractor to demonstrate, after installation, compliance of the underground cable circuits with explicit specifications. (Pl.'s Resp., Ex. T at L108-3.6.) It says nothing of, nor does it conflict with, any burden GP 60-02 imposes on the Owner to inspect, test and approve component materials before incorporation into the work.

Finally, the Court rejects MSCAA's argument that it was under no obligation to test the cable prior to installation because, according to industry custom, the Owner does not generally test

standard manufactured products that are represented to meet standard specifications. (Pl.'s Suppl. Resp. Opp. Def.'s Mot. Summ. J. ("Pl.'s Suppl. Resp.") at 4-7.)  In support, the Plaintiff cites the deposition testimony of Nehring's expert, Eugene Herring, who stated that owner's generally do not test Federal Aviation Administration ("FAA") approved products, but rather rely on the contractor to provide whatever is specified. (Dep. Eugene Herring ("Herring Dep.") at 38-39.) Similarly, Gary Scruggs, of the Pickering Firm, testified that it is not customary practice in his profession to test material or products where the cut sheet indicates that the cable meets the FAA specifications. (Dep. Gary Scruggs ("Scruggs Dep.") at 77.)  However, neither party contended, nor does the Court find, that the language set forth in GP 60-02 is ambiguous.  Thus, the evidence of industry custom or practice relied upon by MSCAA is inadmissible in determining the parties intent regarding testing of the cable.  Airline Constr., Inc. v. Barr, 807 S.W.2d 247, 272 (Tenn. Ct. App. 1990) (finding testimony regarding trade custom irrelevant where the contract is unambiguous).

Resolution of the instant motion does not end with the Court's conclusion that GP 60-02 does in fact apply to the cable at issue here.  After requiring the Engineer to inspect, test and approve all materials used in the work prior to installation, GP 60-02 contemplates and sets forth liability in the event such measures are not taken.  Specifically, the provision states that

> [a]ny work in which untested materials are used without approval or written permission of the Engineer shall be performed at the Contractor's risk.  Materials found to be unacceptable and unauthorized will not be paid for and, if directed by the Engineer, shall be removed at the Contractor's expense.

(Pl.'s Resp., Ex. K at GP 60-02.)  Thus, pursuant to the explicit terms of the Construction Contract, breach by the Owner of its obligation to inspect, test and approve does not in and of itself relieve the Contractor of responsibility for the installation of nonconforming materials.  Rather, where the Contractor proceeds to install untested *and* unapproved materials that are non-conforming, it remains

13

liable for the costs of replacement. However, approval of untested materials by the Engineer appears to shift the liability from the Contractor to the Owner.

The Defendants maintain in their motion that, while MSCAA did not inspect or test the cable, it "accepted" the cable before installation. In support, they offer the deposition testimony of David Webb, Allen & Hoshall's construction project manager, who testified that the cable was accepted based "upon the way it was submitted." (Dep. David Webb ("Webb Dep.") at 427.) While not explained by IVP and FFIC, it appears that the "acceptance" relates to the Design Engineer's approval of the submittal for the airport lighting cable on June 9, 1998. As noted above, this submittal was a cut sheet supplied by Nehring to Jaco, who in turn provided it to IVP. As submitted to and approved by the Pickering Firm, the cut sheet described the airport lighting cable as "single conductor composed of . . . stranded copper . . . cross-linked polyethylene insulation, rated 600 volts or 5000 volts as identified." (Pl.'s Resp, Ex. B.) Under "Specifications," the cut sheet notes that cable met specifications for "Federal Aviation Administration per L-824, type C." (Pl.'s Resp, Ex. B.)

As a preliminary matter, the Court concludes that, at most, the approval of the submittal provides acceptance of only that cable which conformed to the specifications set forth on the cut sheet. The Design Engineer's approval expressly limited approval to cable "as submitted." Therefore, any cable not conforming to those specifications was necessarily not included in the approval. The instant action by MSCAA is premised on allegations that the cable ultimately installed by IVP did not meet contract specifications, specifically those requiring that the cable insulation be crosslinked polyethylene. (Am. Compl. ¶ 12.) The Defendants have not demonstrated that the cable installed met those specifications. Because MSCAA's approval of cable was expressly

limited to that which contained crosslinked polyethylene insulation and because a genuine issue of material fact exists as to whether the cable installed by IVP contained cable of that type, summary judgment is not appropriate.

Further, based on express language in the Construction Contract, as noted below, it is not clear that approval of the submittal can provide a basis for acceptance of installation of non-conforming material. As referred to above, the submittal process set forth in SC 110 occurs prior to the ordering of materials for the project. (Pl.'s Resp., Ex. A at SC 110-1.02(A)(1).) The materials were not present for Plaintiff's inspection, testing, or approval at the time the submittal was approved by the Design Engineer. As such, any non-conformity with the specifications stated in the cut sheet would not be evident or discoverable at that time. Perhaps in light of this, SC 110 explicitly provides that

> acceptance will not relieve Contractor or Subcontractor of responsibility for accuracy of submittals, proper fitting, coordination, construction or work, and furnishing materials and work required by Contract but not indicated on submittals. Review of submittals shall not be construed as accepting departures from Contract requirements.

(Pl.'s Resp., Ex. A at SC 110-3.01(B).) Here, MSCAA alleges that the cable, as installed in Project 6500, did not conform to the specifications of the Construction Contract. Therefore, pursuant to SC 110, the submittal does not demonstrate Plaintiff's acceptance of non-conforming cable.

The Defendants have failed to demonstrate that the Plaintiff authorized installation of non-crosslinked polyethylene insulated cable in Project 6500. Because GP 60-02 expressly places liability on the Contractor for installation of non-conforming cable that was both untested and unauthorized, IVP and FFIC are not entitled to summary judgment on the basis of MSCAA's failure to test the cable prior to installation.

## CONCLUSION

For the reasons stated herein, the motion of the Defendants for summary judgment as to MSCAA is DENIED.

IT IS SO ORDERED this 17th day of August, 2006.

        s/ J. DANIEL BREEN
        UNITED STATES DISTRICT JUDGE