IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MEMPHIS-SHELBY COUNTY
AIRPORT AUTHORITY,

      Plaintiff/Counter-Defendant,

v.                             No. 01-3041 B

ILLINOIS VALLEY PAVING COMPANY,

      Defendant/Counter-Plaintiff.

_____

ILLINOIS VALLEY PAVING COMPANY,

      Third-Party Plaintiff,

v.

JACO AIRFIELD CONSTRUCTION, INC.,

      Third-Party Defendant.

_____

JACO AIRFIELD CONSTRUCTION, INC.,

      Fourth-Party Plaintiff,

v.

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

      Fourth-Party Defendants.

_____

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

      Fifth-Party Plaintiffs,

v.

AMERACE, a Division of Thomas & Betts Corporation,

      Fifth-Party Defendant.

_____

ILLINOIS VALLEY PAVING COMPANY,

      Cross-Plaintiff,

v.

NEHRING ELECTRICAL WORKS COMPANY,
GRAYBAR ELECTRIC COMPANY, INC.,

      Cross-Defendants.

_____

FIREMAN'S FUND INSURANCE COMPANY,

      Defendant/Cross-Claimant,

v.

JACO AIRFIELD CONSTRUCTION, INC.,
NEHRING ELECTRICAL WORKS COMPANY, and
GRAYBAR ELECTRIC COMPANY, INC.,

      Cross-Defendants.

_____

### ORDER GRANTING MOTION OF FOURTH-PARTY PLAINTIFF JACO AIRFIELD CONSTRUCTION CO. FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY AGAINST FOURTH-PARTY DEFENDANT GRAYBAR ELECTRIC CO., INC.

_____

      Plaintiff, Memphis-Shelby County Airport Authority ("MSCAA"), brought the instant action for breach of contract against the Defendants, Illinois Valley Paving Co. ("IVP") and Fireman's Fund Insurance Co. ("FFIC") arising from a contract between MSCAA and IVP for the reconstruction and extension of a runway at the Memphis International Airport ("Airport") in Memphis, Tennessee.  Before the Court is the motion of Fourth-Party Plaintiff Jaco Airfield

2

Construction, Inc. ("Jaco") for summary judgment against Fourth-Party Defendant Graybar

Electrical Co., Inc. ("Graybar") pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Graybar has responded, and this motion is now ripe for disposition.  For the reasons set forth below,

the Fourth-Party Plaintiff's motion for summary judgment is GRANTED.

<u>BACKGROUND</u>

The following facts are undisputed unless noted.  On April 18, 1998, MSCAA and IVP

entered into a contract ("Construction Contract") pursuant to which IVP agreed to act as general

contractor for the reconstruction and extension of a portion of Runway 18C-36C and related taxiway

(collectively referred to as the "World Runway") at the Airport ("Project 6500").  (Am. Compl. ¶

4, Ex. A).  On December 28, 2001, MSCAA filed the instant action against IVP[1] alleging that it

breached the Construction Contract by installing underground airport lighting cable that did not

conform to Specifications Item L-108 requiring that such cable be made of cross-linked polyethylene

insulation.[2]  (Am. Compl. ¶ 21).

Prior to entering into the contract with MSCAA, IVP subcontracted with Jaco for the

installation of the electrical cable and airfield lighting system.  (Am. Compl. ¶ 7).  The cable

---

[1] The Plaintiff subsequently amended its complaint on September 22, 2003 to name FFIC as an additional defendant.

[2]   Specification Item L-108 of the Construction Contract provides that

[u]nderground cable shall conform to the requirements of AC 1504/5345-7, Specification for L-824 Underground Electrical Cable for Airport Lighting Circuits.  Type C single and multiple conductor cables rated 600 volts and 5000 volts shall have a minimum .110 cross-linked polyethylene insulation.  Multiple conductor cable shall have an overall jacket.
> (a) Cable for airfield lighting service shall be No. 8 AWG, type C, copper, 7-strand, single conductor cable with 5,000 volt cross-linked polyethylene insulation.

(Am. Compl. ¶ 9; Pl.'s Resp. Opp. Def.'s Mot. Summ. J., Ex. T at L-108).

3

installed by Jaco on Project 6500 was supplied by Graybar and manufactured by Fourth-Party

Defendant Nehring Electrical Works Co. ("Nehring").  (Def. IVP's Response to Pl.'s Mot. Summ.

J. at 2).  The subcontract required Jaco to comply with the provisions of the Construction Contract

between IVP and MSCAA.[3]  (IVP's Statement of Undisputed Material Facts ¶ 11; Id., Ex. E).  The

subcontract further provided that Jaco would be held liable for any defective work or material as

long as IVP was liable under the Construction Contract.  (Id. ¶ 17).

    In order to fulfill its obligations under the subcontract, Jaco sought bids for L-824C cable.

(Jaco's Statement of Undisputed Material Facts ¶ ¶ 9-11).  In response, On April 30, 1998, Graybar

sent Jaco a document entitled "Quotation," which listed, among other things, Graybar's price for L-

824C cable.  (Graybar's Resp. Opp. Jaco's Mot. Summ J., ex. I).  The reverse side of the quotation

sheet contained the following relevant provisions, entitled TERMS AND CONDITIONS OF SALE:

> 7.  WARRANTIES – Seller warrants that all goods sold are free of
> any security interest and will make available to Buyer all transferable
> warranties made to Seller by the manufacturer of the goods.
> SELLER MAKES NO OTHER EXPRESS OR IMPLIED
> WARRANTIES AND SPECIFICALLY MAKES NO IMPLIED
> WARRANTIES OF MERCHANTABILITY OR FITNESS FOR
> PURPOSE.  UNLESS OTHERWISE AGREED IN WRITING BY
> AN AUTHORIZED REPRESENTATIVE OF SELLER,
> PRODUCTS SOLD HEREUNDER ARE NOT INTENDED FOR
> USE IN OR IN CONNECTION WITH A NUCLEAR FACILITY.

---

[3]Article One of the Subcontract provides:

> The General Contract, as the term is used herein, also includes all
> documents appurtenant thereto including, but not limited to (1) Plans, (2)
> Specifications, (3) Drawings, (4) General and Special Conditions, (5)
> Addenda, and (6) _____ (list other documents).  The General
> Contract is hereby made a part of this Agreement.  The
> SUBCONTRACTOR will adhere to and be bound by all the
> requirements of the General Contract.

(Emphasis added).

8.  LIMITATION OF LIABILITY – Buyer's remedies under this agreement are subject to any limitations contained in manufacturer's terms and conditions to Seller, a copy of which will be furnished upon written request.  Furthermore, Seller's liability shall be limited to either repair or replacement of the goods or refund of the purchase price, all at Seller's option, and in no case shall Seller be liable for incidental or consequential damage.   In addition, claims for shortages, other than loss in transit must be made in writing not more than five (5) days after receipt of shipment.
   . . . .

10.  MODIFICATION OF TERMS AND CONDITIONS – No terms and conditions other than those stated herein, and no agreement or understanding in any way to modify these terms or conditions, shall be binding on Seller without the Seller's written consent.

(Id.).

After determining Graybar was the lowest bidder, Jaco sent to Graybar a purchase order for the L-824C cable containing terms and conditions which were different and conflicted with the proposal from Graybar.  (Jaco's Mot. Summ. J., ex. 1).  The following are the relevant provisions:

Indemnity: Supplier [Graybar] agrees to hold harmless and indemnify JACO from and against any and all claims, demands, actions, or causes of action, including but not limited to, any and all costs, expenses, legal fees and liabilities incurred in and about the investigation and defense thereof, arising from or in any way connected with the performance of supplier, its agents, servants, or employees under this contract.
   . . . .

Warranty: Seller [Graybar] warrants that the goods delivered hereunder will conform strictly to the specifications, drawings, or sample specified or furnished and will be fit and sufficient for the purpose intended, of merchantable quality, of good material and workmanship, free from defect for a period of eighteen (18) months from the date of shipment, or one (1) year from the date of commercial operation.  The materials furnished hereunder shall become the property of purchaser when delivered; provided, however, that the purchaser may reject any such materials as do not comply with the specific specifications for materials and warranties of the seller and manufacturer, and any defective materials, either before or after incorporation of such materials into the project; provided such rejection is made within one (1) year of date of

5

delivery. . . .  All manufacturer's warranties and guaranties of materials shall be transferred and assigned to the purchaser upon delivery of materials and before payment is made for such materials. This warranty shall survive any inspection, deliver or acceptance, or payment for, the goods by purchaser.  This warranty shall be in addition to all warranties provided by law.

(Id.).

In its original complaint, MSCAA claimed that IVP breached the Construction Contract by installing underground airport lighting cable that failed to conform to the contractual requirement that the cable be made of cross-linked polyethylene insulation.[4]  (Am. Compl. ¶ 21).  MSCAA contended that the electrical cable and lighting system were defective and unsuitable for use in the World Runway, thereby constituting a breach of the Construction Contract by IVP.  (Am. Compl. ¶ ¶ 21-22).

Testing of various samples of cable from project 6500 revealed that some of the samples failed to meet FAA requirements for the degree of cross-linking.  (Am. Compl. ¶ 10; Pl.'s Statement of Undisputed Material Facts ¶ ¶ 23-26).  Based upon the installation of non-conforming cable, MSCAA never gave final acceptance on Project 6500.[5]  (Joseph M. Polk ("Polk") Dep. at 132-33; Pl.'s Statement of Undisputed Material Facts ¶ 28).  Instead, the Plaintiff contacted IVP and requested that the Defendant remove and replace the defective and non-conforming cable.  (Am.

───────────────

[4]Thereafter, IVP filed a cross-claim against Jaco, which in turn filed cross-claims against Nehring and Graybar, prompting IVP to also file claims against Nehring and Graybar.

[5]  GP 50-15 FINAL ACCEPTANCE of the Construction Contract provides, in relevant part, that "[u]pon due notice from the Contractor of presumptive completion of the entire project, the Engineer and Owner will make an inspection.  If all construction provided for and contemplated by the contract is found to be completed in accordance with the contract, plans and specifications, such inspection shall constitute the final inspection.  The Engineer shall notify the Contractor in writing of final acceptance as of the date of the final inspection." (Pl.'s Mot. Partial Summ. J. at 3, n. 3).

Compl. ¶ 18).   After IVP's continuing refusal to replace the non-conforming cable, MSCAA

decided, in May 2002, to have the cable replaced by another company.   (Pl.'s Statement of

Undisputed Material Facts ¶ ¶ 27, 29).

STANDARD OF REVIEW

Rule 56( c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact and that the moving party is entitled
> to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986);

Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing

a motion for summary judgment, the evidence must be viewed in the light most favorable to the

nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct.

1348, 1356 (1986).  When the motion is supported by documentary proof such as depositions and

affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some

"specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324, 106 S. Ct.

at 2552.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the

material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  These facts must

be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could

find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986).  Summary judgment must

be entered "against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.  In this circuit, "this requires the nonmoving party to

'put up or shut up' [on] the critical issues of [his] asserted causes of action." <u>Lord v. Saratoga Capital, Inc.</u>, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." <u>Adams v. Metiva</u>, 31 F.3d 375, 379 (6th Cir. 1994).

ANALYSIS

I.    <u>BREACH OF CONTRACT</u>

Jaco contends that its blanket purchase order constituted a contract between itself and Graybar, that Graybar breached the agreement by providing Jaco defective L-824C cable, and that it incurred economic loss as a result. Because no genuine issue of material fact exists, Jaco maintains that it is entitled to judgment as a matter of law. Graybar responds that it did not breach the contract with Jaco because the terms it provided to Jaco in its price quotation, not the terms in the Fourth-Party Plaintiff's purchase order, control the agreement between the parties pursuant to section 2-207 of the Uniform Commercial Code. <u>See</u> Tenn Code Ann. § 47-2-207. Graybar also claims Jaco is not entitled to summary judgment because its damages, if any, are speculative. The parties do not dispute that Tennessee law applies.

Initially, the Court must determine what provisions of the conflicting writings controls the rights and obligations of the parties. A transaction for the sale of goods resulting in consequential damages is governed by the provisions of the Uniform Commercial Code ("UCC"). <u>Trinity Indus., Inc. v. McKinnon Bridge Co.</u>, 77  S.W.3d 159, 172-74 (Tenn. Ct. App. 2001). Tennessee Code Annotated section 47-2-207 provides,

> Additional terms in acceptance or confirmation
>
> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an

8

acceptance even though it states terms <u>additional to or different from</u> those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The <u>additional</u> terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) <u>Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chapters 1-9 of this title.</u>

Tenn. Code Ann. § 47-2-207 (emphasis added).  Tennessee law also looks to the course of dealing between the parties in certain instances:

Course of dealing and usage of trade

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

Tenn. Code Ann. § 47-1-205.

In this case, Jaco began seeking bids for L-824C cable after it was awarded the subcontract. Graybar submitted its proposed bid via its document entitled "Quotation."  Considering the course of dealing between the parties, the Court considers Jaco's seeking of bids as invitations to make offers, and Graybar's subsequent "Quotation" as the offer.  <u>See</u> <u>Challenge Mach. Co. v. Mattison Mach. Works</u>, 359 N.W.2d 232 (Mich. 1984) (holding under the UCC with facts similar to the

instant case that a price quotation sheet was the offer and a subsequent purchase order the acceptance).

In its "Quotation," Graybar expressly disavowed any warranty of merchantability, as it was allowed to do under provisions of the UCC. <u>See</u> Tenn. Code Ann. § 47-2-316.[6]  It also disclaimed any liability for consequential or incidental damages, limiting its liability to replacement of the goods or the purchase price.  Jaco's purchase order, however, contained a warranty clause and an indemnity clause, the terms and conditions of which were nearly opposite from the terms outlined in Graybar's offer.  The Court therefore finds that Jaco's contrasting language constituted <u>different</u> terms rather than <u>additional</u> ones.  <u>See, e.g.</u>, <u>United Foods, Inc. v. Hadley-Peoples Mfg. Co.</u>, No. 02A01-9305-CH-00111, 1994 WL 228773 (Tenn. Ct. App., at Jackson, May 20, 1994) (stating that [w]hile T.C.A. § 47-2-207(1) applies to an acceptance that states terms "additional or different from those offered," the text of T.C.A. § 47-2-207(2) refers only to additional terms. The price change

---

[6]    Exclusion or modification of warranties

. . . .

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

. . . .

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this chapter on liquidation or limitation of damages and on contractual modification of remedy (§§ 47-2-718 and 47-2-719).

Tenn. Code Ann. § 47-2-316(2), (4).

10

on Seller's invoice is a different term, not an additional term and, therefore, T.C.A. § 47-2-207(2) is inapplicable").

In <u>Challenge Machinery Co.</u>, a Michigan state court was presented with a set of facts strikingly similar to those in this action. Challenge Machinery Co. ("Challenge") and Mattison Machine Works ("Mattison") through its agent J. Lee Hackett Co. ("Hackett") "began negotiations for the purchase by Challenge of a Mattison precision surface grinder." <u>Challenge Machinery Co.</u>, 359 N.W.2d at 234. Thereafter, Hackett sent Challenge a price quotation that included language indicating that the terms of the agreement were only those contained within the price quotation's terms and conditions and that any order containing different or additional terms would not be binding upon Mattison absent its written consent. <u>Id.</u> The price quotation expressly limited Mattison's liability to replacement or repair and disclaimed all express and implied warranties. <u>Id.</u> Challenge responded to the quotation by issuing a purchase order which stated that Challenge "expressly limits acceptance to the terms hereof and no different or additional terms proposed by seller shall become part of the contract." <u>Id.</u> The purchase order also contained an express warranty and an indemnification clause. <u>Id.</u>

Inevitably, the machine malfunctioned and Challenge filed suit, claiming nearly $100,000 as its incidental and consequential damages. <u>Id.</u> The trial court granted Mattison/Hackett's motion for summary judgment, finding the Mattison/Hacket price quotation was the offer and that it limited acceptance to the terms contained within. <u>Id.</u> On appeal, the Michigan Court of Appeals began by determining whether a contract between the parties existed. <u>Id.</u> at 235. It concluded that based upon the conduct of the parties in negotiating prior to the price quotation, the quotation operated as an offer and the purchase order as the acceptance under section 2-207 of the UCC. <u>Id.</u> However, the

appellate court disagreed with the trial court's conclusion that the terms of the offer controlled,

stating,

> [c]learly, the form submitted by Challenge included terms different from those contained in the Hackett proposal. However, after careful review of the documents, we do not find that Challenge expressly made its acceptance conditional on Hackett's and Mattison's assent to those different terms. The conditional assent provision has been narrowly construed to require that the acceptance must clearly reveal that the offeree is unwilling to proceed unless assured of the offeror's assent to the additional or different terms. See, e.g., Idaho Power Co. v. Westinghouse Electric Corp., 596 F.2d 924 (CA9, 1979), Dorton v. Collins & Aikman Corp., 453 F.2d 1161 (CA6, 1972). We find nothing in the purchase order which illustrates Challenge's unwillingness to proceed unless it obtained the assent of the sellers. Contrariwise, we find that the purchase order was responsive to the price quotation and that it was a "definite and seasonal expression of acceptance" as required by UCC § 2-207. Thus, we agree with the trial court that the writings of the parties do establish a contract. . . .
>
> On the question of the terms of the parties' contract, we disagree with the trial court and find that the conflicting provisions of the forms did cancel each other out and did not become a part of the contract

Id. at 235-37.

The Court notes that the situation arising from conflicting forms as evidenced in Challenge

Machinery Co. and this case is addressed in the official comments to Tennessee Code Annotated

section 47-2-207. Comment 6 provides in relevant part,

> [w]here clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself.  As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract.  The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2).

Tenn. Code Ann. § 47-2-207, Comment 6.

12

The Court finds that Jaco's purchase order was the acceptance of Graybar's previous offer and not a counter-offer under the UCC. The Court further concludes that the parties' differing terms on the warranty and liability provisions of their respective writings cancel each other out. See id. Therefore, the respective rights of the parties concerning liability and warranty are controlled by the relevant provisions of the UCC, as adopted under Tennessee state law. Id.

The Court must now consider whether Jaco is entitled to summary judgment based upon (1) Graybar's shipment of non-conforming goods, or (2) Graybar's breach of the implied warranty of merchantability.

Under the terms of the parties' agreement, Graybar was required to provide Jaco L-824C cable made entirely of cross-linked polyethylene insulation. See supra note 2. However, it is undisputed that the Nehring cable Graybar actually sent to Jaco failed to conform, in part, to this contractual requirement. It is also undisputed that Jaco accepted the Nehring cable and installed it on Project 6500. Tennessee Code Annotated section 47-2-607 addresses the effect of acceptance of non-conforming goods as follows:

> Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over
>       . . . .
> (3) Where a tender has been accepted:
> (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and
>       . . . .
> (4) The burden is on the buyer to establish any breach with respect to the goods accepted.

Tenn. Code Ann. § 47-2-607(3), (4).

The Court finds that Jaco's notice to Graybar of the defective nature of the Nehring cable

was made within a reasonable time after Jaco's discovery of the nonconformity.  See (Jaco's Mot. Summ. J. at 14; Jaco's Statement of Undisputed Material Facts ¶ 42).  Indeed, the rather extensive record in this case reflects that Jaco, Graybar, and Nehring were all aware of MSCAA's claim that the Nehring cable was unacceptable and non-conforming before MSCAA filed its claim against IVP.  In conclusion, the Court finds Graybar breached its contract with Jaco under the foregoing provisions of Tennessee law.[7]

## II.   BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

Jaco also contends that it is entitled to summary judgment under its claim for breach of the implied warranty of merchantability.  Graybar counters that its "Quotation" specifically excluded such a warranty and that the terms of the "Quotation" govern the rights of the parties pursuant to Tennessee Code Annotated section 47-2-207.

The Court concludes, pursuant to its analysis in Section I, supra, that the UCC as adopted by Tennessee law controls the terms of the parties agreement with respect to the implied warranty of merchantability.  Tennessee Code Annotated section 47-2-314 provides:

> (1) Unless excluded or modified (§ 47-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> (2) Goods to be merchantable must be at least such as:
>
> (a) pass without objection in the trade under the contract description; and
>           . . . .
> (c) are fit for the ordinary purposes for which such goods are used; and
> (d) run, within the variations permitted by the agreement, of even

---

[7]Concerning Graybar's claim that Jaco's damages are speculative, thereby precluding recovery, the Court notes it rejected this argument in a previous order and does so again.  See (Order Den. Nehring & Graybar's Mot. Summ. J., Sept. 19, 2006, at 6-9).

kind, quality and quantity within each unit and among all units involved; and

   . . . .

(3) Unless excluded or modified (§ 47-2-316) other implied warranties may arise from course of dealing or usage of trade.

Tenn. Code Ann. § 47-2-314.  The Court finds Graybar breached the UCC's implied warranty of merchantability by supplying Jaco with cross-linked polyethylene insulation cable that did not comply with the Construction Contract specifications that such cable be made entirely of cross-linked polyethylene insulation.  See Tenn. Code Ann. § 47-2-314(2)(a), (c), (d).

CONCLUSION

Based upon the foregoing authorities, Jaco's motion for summary judgment on the issue of liability against Graybar is GRANTED.[8]

IT IS SO ORDERED this 1st day of November, 2006.

        s/ J. DANIEL BREEN
        UNITED STATES DISTRICT JUDGE

---

[8]The Court notes that in its reply, Jaco adopted IVP's common law indemnification argument as an alternative theory for summary judgment.  However, because this Court has concluded that Jaco prevails under its contract and Tennessee statutory law, it need not address Jaco's common law indemnification argument against Graybar.